# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MICHIGAN

RUTH JOHNSON, TERRI LYNN
LAND, and MARIAN SHERIDAN,

    Plaintiffs,

          v.

JOCELYN BENSON, Secretary of
State of the State of Michigan, in her
official capacity,

    Defendant.

Civil Action No. 1:20-cv-00948

**ORAL ARGUMENT
REQUESTED**

## MEMORANDUM IN SUPPORT OF PLAINTIFFS'
## MOTION FOR A PRELIMINARY INJUNCTION

This case challenges a patently unlawful policy of the Michigan Secretary of State to count ballots received after Election Day. Pursuant to its constitutionally delegated authority, the Michigan Legislature established a bright-line deadline of 8:00 p.m. on November 3, 2020, for mail-in ballots to *arrive* at polling places. It chose November 3 because Congress set the Tuesday after the first Monday in November as a uniform Election Day—the day the voting process must be *consummated*—over 150 years ago. By law, ballots that fail to meet these deadlines are not to be counted. But the Secretary is acting to move that deadline *fourteen days*, with no colorable basis in legislative authority and in direct conflict with crystal-clear statutory mandates. Worse, application of that policy to ballots received without a postmark will permit votes to be cast after Election Day, in clear violation of federal law.

This is an *ultra vires* exercise of power that conflicts with the United States Constitution in two independent respects. First, Article II mandates that the rules governing presidential elections be set by Congress or the "Legislature" of each state, and the Secretary is neither. She therefore has no independent power to set the time or manner of presidential elections, let alone to do so through actions that directly conflict with acts of Congress and the State Legislature. Second, Congress established by statute November 3 as Election Day, and the Secretary has agreed to count ballots received after Election Day. By refusing to treat November 3 as the consummation of the voting—but merely its *beginning*—the Secretary has violated federal law, and her policy must yield.

The Secretary's decision to count unlawfully cast ballots promises to inflict severe vote dilution on Plaintiffs and all other Michigan voters and to injure certain Plaintiffs directly, as Presidential Elector candidates. Worse, the choice to depart from the laws of the Michigan Legislature threatens to cast the legitimacy of the entire statewide vote in doubt and creates a significant risk that Congress will not recognize the certified election results. These are irreparable harms, and the public interest plainly favors an injunction that would prevent them. The Court should act promptly to do just that.

## BACKGROUND

### I.  Congress and the Michigan Legislature Exercise Their Constitutional Authority To Establish a Single Election Day, Which Is November 3 This Year

Article II of the Constitution establishes state and federal roles in enacting the laws governing presidential elections. Article II, § 1, cl. 2 identifies states'

role as: "appoint[ing] in such Manner as the *Legislature* thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. Art. II, § 1, cl. 2 (emphasis added). The term "Legislature" in this provision means what it says. The legislature of each state, not its executive actors or courts, has authority to define the "Manner" of choosing electors. *See, e.g.*, *McPherson v. Blacker*, 146 U.S. 1, 25 (1892). In Michigan, the "Legislature" within the meaning of Article II is the Michigan Legislature.

The role of Congress is governed by Article II, § 1, cl. 4, which provides that "Congress may determine the Time of chusing the Electors, and the Day on which they shall give their Votes; which Day shall be the same throughout the United States." Congress has acted under this authority to set the time of choosing electors, and various statutes, taken together, "mandate[] holding all elections for Congress and the Presidency on a single day throughout the Union." *Foster v. Love*, 522 U.S. 67, 70 (1997). This "immediate act of the people of America" protects the selection of the President from "cabal, intrigue, and corruption." The Federalist No. 68 at 459 (Hamilton) (Cooke ed., 1961).

Both Congress and the Michigan Legislature have exercised their respective authorities to regulate presidential elections.

### A.    Congress Exercised Its Power

Congress has exercised its authority by setting a single Election Day. Congress provided that "[t]he electors of President and Vice President shall be appointed, in each State, on the Tuesday next after the first Monday in November,

in every fourth year succeeding every election of a President and Vice President." 3 U.S.C. § 1. This year, that date is Tuesday, November 3, 2020.

This statute necessarily forbids states from holding votes for the presidency *after* November 3. Another statute provides: "Whenever any State has held an election for the purpose of choosing electors, and has failed to make a choice on the day prescribed by law, the electors may be appointed on a subsequent day in such a manner as the legislature of such State may direct." 3 U.S.C. § 2. This statute only applies if a state has held an election and failed "to make a choice on the day prescribed by law…." It does not authorize states to allow voting in that election on days after the Tuesday after the first Monday in November.

Congress also set the time for electors appointed in each state to meet and vote: "The electors of President and Vice President of each State shall meet and give their votes on the first Monday after the second Wednesday in December next following their appointment at such place in each State as the legislature of such State shall direct." 3 U.S.C. § 7. This year, that date is December 14, 2020. A state that fails to comply with these acts of Congress forfeits its votes in the Electoral College.

In addition, Congress provided a statutory safe harbor to allow states to provide a binding determination of its electors' vote. 3 U.S.C. § 5. To qualify for the safe harbor, a state must have "provided, by laws enacted prior to the day fixed for the appointment of electors," a means of determining "any controversy or contest concerning the appointment of" electors, and must have completed

4

the process "at least six days before the time fixed for the meeting of the electors." 3 U.S.C. § 5. This year, the safe-harbor deadline is December 8, 2020.

### B.     The Michigan Legislature Exercised Its Power

The Michigan Legislature has exercised its constitutional duty to establish rules governing the manner of presidential elections. Michigan assigns all of its electors to the presidential candidate who receives the "greatest number of votes" in the statewide vote. Mich. Comp. Laws. § 168.42. Michigan statutes follow federal law and set the state general election as the first Tuesday after the first Monday of November. *Id.* § 168.641. Indeed, Michigan law specifically recognizes the federal government's authority over setting the day for elections, noting that "if congress should hereafter fix a different day for such election, then the election for electors shall be held on such day as shall be named by congress as provided in section 1 of article 2 of the United States constitution." *Id.* § 168.43. Voters may vote in person, and if they do so, they must be in line at the polling place before 8:00 p.m. on voting day, when the polls close. *Id.* § 168.720. In-person voting is not permitted after Election Day.

The Michigan constitution also authorizes in-person absentee voting "during the forty (40) days before an election, and the right to choose whether the absent voter ballot is applied for, received, and submitted in person or by mail." Mich. Const. Art. 2, § 4. No different from voters who elect to vote in person, those who elect to vote by mail must vote on or before Election Day, not after Election Day. Michigan law provides that "[t]he ballot must reach the clerk or an authorized assistant of the clerk before the close of the polls on election day.

An absent voter ballot received by the clerk or assistant of the clerk after the close of the polls on election day will not be counted." Mich. Comp. Laws § 168.764a.[1]

Ballots that are not delivered to the ballot board are not counted. In this way, the law enacted by the Michigan Legislature does not permit the counting of votes contained in absentee ballots received after the 8:00 p.m. deadline.

Michigan law provides that the Secretary is the State's chief elections administrator and administers Michigan's election laws.[2] The Secretary publishes an "Election Officials' Manual" with 18 chapters outlining election rules and procedures. In Chapter 6, titled "Michigan's Absentee Voting Process," the Secretary acknowledges that Michigan law provides that "[a]bsentee ballots must be returned to the clerk by 8:00 p.m. on Election Day." Election Officials' Manual, Chapter 6, at 7 (last updated November 2019).[3] The Secretary's website also continues to recognize that Michigan law provides that "absentee ballot[s] must be received by your city or township clerk by 8 p.m. on Election Day" to be counted.[4] These regulations demonstrate that the Secretary understands

---

[1] Michigan law provides a limited exception for overseas absentee voters to whom absentee voter ballots were not timely transmitted, Mich. Comp. Laws § 168.759a, and Plaintiffs' claims here do not concern that exception.

[2] Among other duties, she "prescribe the procedures for election audits that include reviewing the documents, ballots, and procedures used during an election…" Mich. Comp. Laws § 168.31a (2).

[3] *Available at* https://www.michigan.gov/documents/sos/VI_Michigans_Absentee_Voting_Process_265992_7.pdf.

[4] Michigan Secretary of State, Vote at home/absentee voting, *available at* https://mvic.sos.state.mi.us/Home/VoteAtHome (last accessed on September 24, 2020).

Michigan statutes to establish a non-negotiable deadline of receipt of ballots by 8:00 p.m. on Election Day.

## II.   The Secretary Agrees With Private Litigants To Change the Time and Manner of the Presidential Election

In May 2020, registered Michigan voters and the League of Women Voters of Michigan filed a mandamus complaint against the Secretary in the Michigan Court of Appeals, challenging the constitutionality of the Legislature's deadline for receiving absentee ballots. *League of Women Voters of Mich. v. Sec'y of State*, Case No. 353654, Mich. Ct. of Appeals (May 22, 2020) ("*League of Women Voters*"). Although the Secretary did not oppose the plaintiffs' argument to extend the deadline for receiving absentee ballots, the Michigan Court of Appeals upheld the deadline, and the Michigan Supreme Court denied the parties request for leave to appeal. In an opinion concurring in the denial of a request for reconsideration, Justice Viviano expressed concern that "this lawsuit appears to be a friendly scrimmage," given that the Secretary "agree[s] with plaintiffs that the deadline must be struck down as unconstitutional." *League of Women Voters*, Case No. 161671, Op. at 1 (September 11, 2020) (Viviano, J., concurring).

In June 2020, a group of registered Michigan voters and the Michigan Alliance for Retired Americans (the "State Plaintiffs") pursued another friendly scrimmage, filing a complaint against the Secretary in Michigan state court that challenged, *inter alia*, the Election Day receipt requirements applicable to mail-in absentee ballots. *See* Declaration of Todd Dawson ("Dawson Decl."), Ex. A.

Once again, the Secretary declined to defend Michigan law. She "did not challenge the documentary evidence at the hearing and conceded that the affidavits and documentary evidence provide an evidentiary record from which this Court can make findings for purposes of resolving plaintiffs' request for injunctive relief." Dawson Decl., Ex. B at 2–3. Nonetheless, the court refused to permit the Michigan Senate and the Michigan House of Representatives to intervene and defend state law, thereby excluding adverse parties from participating in the case in any capacity. After permitting no adversarial evidence or arguments before it, the Court concluded that the "unrefuted factual record" and "the uncontroverted data," supported enjoining the ballot receipt deadline. *Id.* at 12. Specifically, the injunction prohibits "[e]nforcement of the ballot receipt deadlines in MCL 168.759b and MCL 168.764a as they relate to the date and time by which absentee ballots must be received by the clerk in order to be tallied…. All ballots postmarked no later than one day before election day, i.e., November 2, 2020, and received by the deadline for certifying election results [fourteen days after Election Day], are eligible to be counted in the same manner as all provisional ballots." *Id.* at 1–2.

The Secretary acquiesced in the decision, declining to appeal and thereby choosing to abandon the enforcement of statutes enacted by the Michigan Legislature in favor of her own policies.

### III. The Secretary's Actions Threaten the Integrity of Michigan's Presidential Election, Risk Disenfranchisement of the Entire State's Electorate, and Impose Irreparable Harm on Plaintiffs

Plaintiff Ruth Johnson is a registered Michigan voter, a former Secretary of State of Michigan, and currently a Michigan State Senator. Declaration of Ruth Johnson ("Johnson Decl."), at ¶¶ 4, 6, 15. Plaintiff Terri Lynn Land is a registered Michigan voter, a former Secretary of State of the State of Michigan, and has been certified as a nominee of the Republican Party to participate in the Electoral College as a presidential elector. Declaration of Terri Lynn Land ("Land Decl."), at ¶¶ 3, 6, 9. Plaintiff Marian Sheridan is a registered Michigan voter and has also been certified as a nominee of the Republican Party to participate in the Electoral College as a presidential elector. Declaration of Marian Sheridan ("Sheridan Decl."), at ¶¶ 3, 8.

The Secretary's actions work a direct and substantial harm on various interests of all Plaintiffs. First, counting ballots received up to fourteen days after the election will necessarily result in the counting of many ballots—perhaps hundreds of thousands—that by law may not be counted in the presidential election. The result of this change in law is to dilute the value of Plaintiffs' votes and permit the counting of ballots for Plaintiffs' opponents for the elector offices they seek. Land Decl. ¶¶ 6–8; Sheridan Decl. ¶¶ 8–11.

Second, the Secretary's actions create substantial uncertainty where those laws create clarity. Statutory law, which is superior to the Secretary's executive authority, establishes a deadline, but Plaintiffs are unable to discern whether that law governs or the Secretary's alterations govern. This uncertainty frustrates

Plaintiffs' ability to determine whether to vote in person (and thereby risk exposure to the Coronavirus) or cast absentee ballots (and thereby risk that their votes will not be counted) and how to advise those who intend to vote for them.

Third, the Secretary's actions threaten to disenfranchise all Michigan voters. A procedure for resolving election contests (which the vote-counting process qualifies as) will not satisfy Congress's safe harbor of 3 U.S.C. § 5 unless it is resolved "by laws enacted prior to the day fixed for the appointment of electors." The late-receipt deadline is not an enacted law but an executive policy in flat contradiction to State law. Adherence to this policy over and against Michigan's "enacted" laws creates a clear and present danger that Michigan's election results will not be accepted under the safe harbor law and therefore will not be accepted by the United States Congress in determining the winner of the presidential election. As the Secretary intends to conduct the election, Congress will have no obligation to respect the popular vote of Michigan's electorate. This threatens Plaintiffs' opportunity to cast meaningful votes and to take office as Electors and participate in the Electoral College.

Fourth, the Secretary's election deadlines risk placing the resolution of the contest past dates Congress has set for both the safe harbor and the actual vote of the Electoral College. Under those deadlines, it will remain unknown who wins the state's vote for at least fourteen days after Election Day, and any contest about the ultimate result is unlikely to reach a conclusion before the safe-harbor deadline or even before the vote of the Electoral College. There is a substantial risk that Plaintiffs' votes will be completely meaningless, if either Michigan loses

its representation in the Electoral College or its asserted results do not qualify for the safe harbor. This is yet another way in which the Secretary's actions threaten Plaintiffs' right to cast meaningful votes and opportunity to participate in the Electoral College.

## LEGAL STANDARD

"The propriety of a preliminary injunction depends on four factors: "(1) whether the movant is likely to prevail on the merits; (2) whether the movant would suffer irreparable injury if the court does not grant the injunction; (3) whether a preliminary injunction would cause substantial harm to others and (4) whether a preliminary injunction would be in the public interest." *Howe v. City of Akron*, 723 F.3d 651, 658 (6th Cir. 2013); *see also Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008).

## ARGUMENT

### I.   Plaintiffs Are Likely To Succeed on the Merits of Their Claim that the Late-Receipt Deadline Violates Federal Law and the Constitution

The Secretary's decision to violate state and federal law by counting ballots received after Election Day is plainly unlawful and is virtually certain to be held as much after final judgment. First, the Secretary lacks the constitutional authority to depart from the laws established by Congress and the Michigan Legislature and to set a completely new set of time-and-manner election regulations that flatly *contradict* those laws. Second, the Secretary's choice to count ballots cast after Election Day plainly contradicts federal law and is preempted.

Each of these violations of the Constitution is itself a sufficient basis for an injunction and establishes that the first element is met.

### A. The Late-Receipt Deadline Is *Ultra Vires* in Violation of Article II of the Constitution

The Secretary's decision to implement a late-receipt deadline violates Article II of the Constitution by arrogating to herself, an executive actor, the authority to regulate presidential elections, which Article II vests solely with legislative actors: Congress and the "Legislature" of each state. Neither the Secretary nor Michigan state courts have any authority to set time or manner regulations governing presidential elections by overriding the law enacted by the Michigan Legislature and yet have purported to do so through a friendly scrimmage with private parties. That is unconstitutional.

The Article II delegation of authority over presidential elections confers on Congress and state legislatures a share of *federal constitutional* lawmaking authority. As the Supreme Court unanimously held in *Bush v. Palm Beach County Canvassing Bd.*, 531 U.S. 70 (2000), "in the case of a law enacted by a state legislature applicable not only to elections to state offices, but also to the selection of Presidential electors, the legislature is not acting solely under the authority given it by the people of the State, but by virtue of a direct grant of authority made under Art. II, § 1, cl. 2, of the United States Constitution." *Id.* at 473–74. This provision "convey[s] the broadest power of determination" and "leaves it to the legislature *exclusively* to define the method" of appointment of electors. *McPherson v. Blacker*, 146 U.S. 1, 27 (1892) (emphasis added). Indeed, because "[t]his

power is conferred upon the legislatures of the States by the Constitution of the United States," it "cannot be taken from them or modified" even by "their State constitutions." *Id.* at 35; *see also Bush v. Gore*, 531 U.S. 98, 112–13 (2000) (Rehnquist, J., concurring).

It necessarily follows that only the Michigan Legislature, not the Secretary or state courts, may establish regulations governing the time and manner of presidential elections. The word "legislature" was "not one 'of uncertain meaning when incorporated into the Constitution.'" *Smiley v. Holm*, 285 U.S. 355, 365 (1932) (quoting *Hawke v. Smith*, 253 U.S. 221, 227 (1920)). The term "legislature" necessarily differentiates between that body and the "State" of which it is only a subpart. By empowering one body of the state to prescribe election rules, the Constitution impliedly denies it to other state bodies and officials, including the Secretary.

Further, the Article II delegation of authority is the states' sole basis for regulating presidential elections. This power is neither inherent nor preserved under the Tenth Amendment. *Cook v. Gralike*, 531 U.S. 510, 522 (2001); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 (1995). Because there is no basis for Michigan to regulate elections to the presidency outside of the delegation of Article II, any "manner" regulation not promulgated by the Michigan Legislature is beyond the very authority of Michigan, as a sovereign, to regulate in this arena.

There is then no authority for the Secretary to establish *any* rules governing the time or manner of presidential elections, let alone rules that *directly*

*contradict* statutes enacted by "the Legislature" of Michigan. U.S. Const. Art. II, § 1, cl. 1. Neither the Michigan Legislature nor Congress passed laws providing that voters may cast ballots received up to *fourteen days* after Election Day, let alone ones cast after Election Day, and the statutory bright-line deadline of 8:00 p.m. on Election Day for ballots to *arrive* reflects a clear and unmistakable legislative *rejection* of the Secretary's position. The Secretary intends to enforce new election rules with no basis whatsoever in the Constitution, federal law, or Michigan statutory law—indeed, the Secretary's policy contravenes what they require. In short, the Constitution delegates no authority to the Secretary or Michigan state courts to override time or manner regulations prescribed by Congress or the Michigan Legislature, and the Secretary's actions are therefore *ultra vires*.

Article II affords this violation of *Michigan* law a *federal* constitutional significance. It is Article II itself that delegates the power to regulate elections, so "the text of the election law itself…takes on independent significance." *Bush*, 531 U.S. at 113 (Rehnquist, J., concurring). "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Id.* The question whether rules promulgated by the Secretary constitute as manner restrictions "direct[ed]" by the Michigan "Legislature," U.S. Const. Art. II, § 1, cl. 2, is a federal constitutional question for this Court to resolve. And the plain answer is no.

**B.    The Secretary's Policy to Count Ballots after Election Day Contravenes Acts of Congress**

The Secretary's policy to count ballots received after Election Day violates federal law yet again insofar as it directly conflicts with Acts of Congress setting the Election Day. The new deadlines and ballot-counting procedures the Secretary has set would therefore be unlawful even if the Michigan Legislature had adopted them.

Courts have uniformly interpreted Article II to confer on Congress a unique authority over presidential elections, which supersedes state authority in the event of a conflict. *See Oregon v. Mitchell*, 400 U.S. 112, 124, (1970) ("It is the prerogative of Congress to oversee the conduct of presidential and vice-presidential elections and to set the qualifications for voters for electors for those offices."); *cf. Anderson v. Celebrezze*, 460 U.S. 780, 784–85 (1983). Here, Congress has acted definitively by statute to establish the Tuesday after the first Monday in November as the *sole* day for choosing electors for the presidency. 3 U.S.C. § 1. This choice of the Tuesday after the first Monday in November goes back at least to January 1845, which Congress passed in the "Presidential Election Day Act." 28 Cong. Ch. 1, 5 Stat. 721.

As *Foster v. Love*, 522 U.S. 67 (1997) recognized, this provision and others "mandate[] holding all elections for Congress and the presidency on a single day throughout the Union." *Id.* at 70. *Foster* rejected a state's efforts to conduct an election on a day other than Election Day as preempted by act of Congress. *Id.* at 74. Indeed, a single Election Day was what the framers of the Constitution envisioned. Alexander Hamilton opined that "uniformity in the time of

15

elections…may be found by experience to be of great importance to the public welfare," The Federalist No. 61 at 413 (Hamilton) (Cooke ed. 1961) and that "the immediate act of the people of America" in selecting electors would frustrate "cabal, intrigue, and corruption." The Federalist No. 68 at 459 (Hamilton) (Cooke ed., 1961). Indeed, during the reconstruction era, "Congress expressly considered [and rejected] an amendment to continue to allow states in which by law polls are held open more than one day to continue the practice." *Voting Integrity Project, Inc. v. Keisling*, 259 F.3d 1169, 1173 (9th Cir. 2001) (internal quotation marks omitted). Congress rejected this proposal for a simple and plain reason: "It gives some states undue advantage. It gives some parties undue advantage." Cong. Globe, 42d Cong., 2d Sess. 141 (1871).[5]

For these reasons, the case law is unanimous that Election Day must be the "consummation" of the process of voting. *Voting Integrity Project*, 259 F.3d at 1175 (applying *Foster*, 522 U.S. at 67). There is "no dispute that the combined actions [by officials and voters] must occur, that voting must end, on federal election day." *Lamone v. Capozzi*, 912 A.2d 674, 692 (Md. 2006). Any "regime of combined action meant to make a final selection on any day other than federal election day" violates federal law. *Millsaps v. Thompson*, 259 F.3d 535, 547 (6th Cir. 2001). Of unique relevance on this point is *Maddox v. Bd. of State Canvassers*, 149 P.2d 112 (Mont. 1944), which rejected a Montana statute, enacted during World War II, that authorized overseas ballots that arrived in December to be

---

[5] For all of these reasons, the notion the Election Day is unconstitutional is patently incorrect.

counted in the presidential election. *Id.* at 114. Notwithstanding the legislature's good intentions to assist absent servicemembers in voting, the court found the act unconstitutional, holding that "the legislature may not constitutionally extend beyond 'the Tuesday next after the first Monday in November' the time when the presidential electors shall be appointed or elected by the ballots of the voters." *Id.* at 115.

This case is no different. The Secretary's new state-law regime treats Election Day as the beginning, not the consummation, of voting. Under the Secretary's policy, votes will be counted if they arrive up to fourteen days after Election Day—including those not bearing postmarks, as is typical of prepaid-postage envelopes. Dawson Decl., Ex. C. In this way, the Secretary's policies permit the counting of ballots cast after Election Day. These policies contravene the law of Congress and are therefore preempted.

## II. Plaintiffs—and the Entire State of Michigan—Will Suffer Irreparable Harm in the Absence of an Injunction

The Secretary's policy of counting late-received ballots violates state and federal law and will inflict irreparable harm on Plaintiffs, unless this Court intervenes. The Secretary's newfangled policy of counting invalid votes is certain to dilute the value of Plaintiffs' votes. The "principal issue[]" here is "whether the votes that have been ordered to be counted are, under a reasonable interpretation of [Michigan] law, legally cast votes," and the "counting of votes that are of questionable legality…threaten[s] irreparable harm." *Bush v. Gore*, 531 U.S. 1046, 1047 (2000) (Scalia, J., concurring in order issuing stay pending appeal).

By increasing the pool of counted votes to include those illegally cast after Election Day, the Secretary will dilute the votes of all voters who dutifully comply with Michigan statutory law and submit their ballots by Election Day. This is a paradigmatic irreparable harm supporting provisional injunctive relief. "When constitutional rights are threated or impaired, irreparable injury is presumed." *Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). Restricting or diluting "the fundamental right to vote therefore constitutes irreparable injury." *Id.*; *see also Montano v. Suffolk Cty. Legislature*, 268 F. Supp. 2d 243, 260 (E.D.N.Y. 2003) ("An abridgement or dilution of the right to vote constitutes irreparable harm."); *Patino v. City of Pasadena*, 229 F. Supp. 3d 582, 590 (S.D. Tex. 2017) ("The irreparable harm to the plaintiffs' fundamental right to vote weighs heavily against a stay."); *Day v. Robinwood W. Cmty. Improvement Dist.*, 2009 WL 1161655, at *3 (E.D. Mo. Apr. 29, 2009) ("These Plaintiffs are threatened with an irreparable harm because, absent a preliminary injunction, their votes will be diluted in the upcoming June 9, 2009 election."); *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 2016 WL 6584915, at *17 (D.N.J. Nov. 5, 2016) (collecting cases).

And the late-receipt deadline imposes special injury on Plaintiffs Land and Sheridan, who are not only voters, but also candidates for office. Because "the rights of voters and the rights of candidates do not lend themselves to neat separation," *Burdick v. Takushi*, 504 U.S. 428, 438 (1992) (quotation marks and citation omitted), "laws that affect candidates always have at least some theoretical, correlative effect on voters" and vice versa, *Bullock v. Carter*, 405 U.S. 134,

143 (1972); *cf. Mancuso v. Taft*, 476 F.2d 187, 190 (1st Cir. 1973) (permitting "both candidates and voters" to challenge an election law "because of its impact on voting rights," and because a "candidate for public office…is so closely related to and dependent upon those who wish to vote for him and his litigation will so vitally affect their rights…."). The late-receipt deadline violates state and federal law and will dilute all validly cast votes, including all votes validly cast for Plaintiffs as electors. That irreparable injury runs directly to Plaintiffs in their capacity as candidates to represent Michigan as electors.

In addition, the legal infirmity of the late-receipt deadline has created a significant uncertainty about the rules governing the November election and whether *any Michigan citizens* will have their votes counted. Officials and voters, including those who may vote for Plaintiffs Land and Sheridan, need to know what rules govern, both so that they may follow those rules and so that their votes will ultimately factor into the presidential selection. As to the latter, the major problem is that a procedure for resolving election contests (which the vote-counting process qualifies as) will not satisfy Congress's safe harbor of 3 U.S.C. § 5 unless it is resolved "by laws enacted prior to the day fixed for the appointment of electors." *See Bush v. Gore*, 531 U.S. 98, 111 (2000). The late-receipt deadline is not an enacted law but an executive policy in flat contradiction to enacted law. As a result, the implementation of these policies over and against Michigan's "enacted" laws creates a clear and present danger that Michigan's election results will not be accepted under the safe harbor law and therefore will not be accepted by the United States Congress in determining the winner of the

presidential election. As the Secretary intends to conduct the election, Congress will have no obligation to respect the popular vote of Michigan's electorate, and Michigan's popular vote may prove completely worthless.

If it is irreparable harm to dilute even one vote (it is), it is clearly irreparable harm to deny any value to any vote cast by anyone in the entire state of Michigan. That harm would yet again directly impact Plaintiffs in their capacities as candidates to represent Michigan as electors. The Secretary's unlawful policy will confer on Congress the unfettered right to reject the results of the statewide vote and thereby deny Plaintiffs the opportunity to serve as electors and participate in the Electoral College.

A further harm results from the Secretary's election deadlines risk placing the resolution of the contest past dates Congress has set for both the safe harbor and the actual vote of the Electoral College. It will remain unknown who wins the state's vote for at least fourteen days after Election Day, and any contest about the ultimate result is unlikely to reach a conclusion before the safe-harbor deadline or even before the vote of the Electoral College. There is a substantial risk that Plaintiffs' votes will be completely meaningless, if either Michigan loses its representation in the Electoral College or its asserted results do not qualify for the safe harbor.

## III.    The Balance of Equities and the Public Interest Favor an Injunction

There is no contest on the other equitable factors. The public has a "strong interest in exercising the 'fundamental right to vote,'" *Obama for America*, 697 F.3d at 436, which Plaintiffs cannot exercise if their votes are diluted or

completely invalidated by a delayed vote count. *See also Rodgers v. Bryant*, 942 F.3d 451, 458 (8th Cir. 2019) ("[I]t is always in the public interest to protect constitutional rights" and "[t]he balance of equities generally favors...constitutionally-protected freedom[s]") (cleaned up).

The balance of equities is one-sided. On the one hand, the Secretary's policy is sure to inflict substantial vote dilution of millions of Michigan voters (including Plaintiffs) and places the entire statewide vote at risk. That is an injury of the highest and most severe constitutional magnitude, for reasons stated above.

On the other hand, the Secretary has no interest at all in setting rules that the Constitution does not allow her to set. And the Secretary's interest in participating in a friendly scrimmage of a lawsuit—contending nonsensically that Election Day is unconstitutional—carries zero weight. *Cf. Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) (holding that a state has "no...interest in avoiding meritless lawsuits"). Further, even if the Secretary is (somehow) vindicated by the final resolution of this case, the harm of an erroneous ruling at this stage would be non-existent: the Secretary would simply be compelled to conduct this election the way every Michigan Secretary of State has conducted elections for generations. An order compelling the Secretary to do what Michigan law tells the Secretary to do does not inflict any meaningful injury on the Secretary *in her official capacity* (i.e., as an officer of the state charged with carrying out the law enacted by the Legislature)—and certainly not one sufficiently severe as to outweigh the voting rights of every last Michigan citizen. And the State's interest is

21

for the valid laws enacted by its Legislature to be enforced. *See, e.g.*, *Hunter v. Hamilton County Bd. of Elections*, 635 F.3d 219, 244 (6th Cir. 2011) ("The Board has a substantial interest in carrying out its election duties timely and in accordance with state and federal law.").

The public interest emphatically supports a preliminary injunction. Again, "it is always in the public interest to prevent the violation of a party's constitutional rights," *G & V Lounge, Inc. v. Michigan Liquor Control Com'n*, 23 F.3d 1071, 1079 (6th Cir. 1994), and the right to vote of each Michigan citizen hangs in the balance and is directly threatened by the Secretary's unlawful policy. The policies Congress implemented in setting an Election Day well over 100 years ago, and the policies of the Michigan Legislature in establishing a clear received-by deadline, vindicate the public's interest in the integrity of presidential elections and in a clear set of rules—that have proven fair over generations of practice—for voters to follow in casting their votes. Indeed, the Secretary's unlawful policy is of momentous concern to the entire State and the country, "by casting a cloud upon…the legitimacy of the election." *Bush*, 531 U.S. at 1047 (Scalia, J., concurring in order granting a stay pending appeal). No Michigan citizen benefits from that cloud, and every Michigan voter would benefit from an injunction.

## CONCLUSION

The Court should grant the motion and enjoin the Secretary's unlawful policy to count ballots received after 8:00 p.m. on Election Day.

Date: September 30, 2020                    Respectfully submitted,


                                            /s/ Todd A. Dawson
                                            TODD A. DAWSON
                                            BAKER & HOSTETLER LLP
                                            Key Tower, 127 Public
                                            Square, Suite 2000
                                            Cleveland, OH 44114
                                            Phone: (216) 621-0200
                                            Fax: (216) 696-0740
                                            tdawson@bakerlaw.com

                                            DAVID B. RIVKIN*
                                            ANDREW M. GROSSMAN*
                                            RICHARD B. RAILE*
                                            BAKER & HOSTETLER LLP
                                            1050 Connecticut Ave., N.W.
                                            Suite 1100
                                            Washington, D.C. 20036

                                            *Attorneys for Plaintiffs*


* Applications for Admission pending

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been filed on September 30, 2020, via the CM/ECF system, and that the foregoing has been served by hand delivery on Defendant.

Date: September 30, 2020

/s/ Todd A. Dawson
TODD A. DAWSON
BAKER & HOSTETLER LLP
Key Tower, 127 Public
Square, Suite 2000
Cleveland, OH 44114
Phone: (216) 621-0200
Fax: (216) 696-0740
tdawson@bakerlaw.com

*Attorney for Plaintiffs*

## L.R. 7.2(b)(i) CERTIFICATE OF COMPLIANCE

I, Todd A. Dawson, hereby certify that the above Memorandum of Points and Authorities in Support of Plaintiffs' Motion for a Preliminary Injunction complies with Local Rule 7.2(b)(i).

I further certify that, in preparation of the above document, I obtained the word count from Microsoft Word and the above document contains 5,701 words.

Date: September 30, 2020

/s/ Todd A. Dawson
Todd A. Dawson
Baker & Hostetler LLP
Key Tower, 127 Public
Square, Suite 2000
Cleveland, OH 44114
Phone: (216) 621-0200
Fax: (216) 696-0740
tdawson@bakerlaw.com

*Attorney for Plaintiffs*